Diana RUSSELL, Plaintiff,

v.

**BRONSON HEATING AND COOLING,** Andrew Bronson, and BCN Services Urban, Inc. Appellee.

No. 03–73871.

United States District Court, E.D. Michigan, Southern Division.

Nov. 16, 2004.

Janis Adams, Birmingham, MI, for plaintiff.

Marian Faupel, Ann Arbor, MI, for defendant.

***OPINION AND ORDER: (1) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT; (2) DENYING DEFENDANT BHC'S MOTION FOR SANCTIONS***

BORMAN, District Court Judge.

***BACKGROUND:***

In this action, Plaintiff Diana Russell ("Plaintiff") brought suit against Bronson Heating and Cooling, Inc., Andrew Bronson, individually, (collectively "BHC") and BCN Services Urban, Inc. ("BCN"). The Complaint contains the following counts:

Count I—Sex Harassment and Discrimination, including Pregnancy Discrimination, under Title VII of the Civil Rights Act of 1964 against all Defendants;

Count II—Retaliation under Title VII of the Civil Rights Act of 1964 against all Defendants;

Count III—Sex Harassment and Discrimination, including Pregnancy Discrimination under Michigan's Elliot–Larsen Civil Rights Act against Defendants Bronson Heating and Cooling, Inc. and Andrew Bronson and BCN Services Urban, Inc.;

Count IV—Retaliation under Michigan's Elliot–Larsen Civil Rights Act against Defendants BHC and BCN;

Count V—Violations of Entitlements under the Family Medical Leave Act of 1993 against all Defendants;

Count VI—Retaliation and Discrimination under the Family Medical Leave Act of 1993 against all Defendants;

Count VII—Assault and/or Battery against Defendant Andrew Bronson; and

Count VIII—Violation of the Bullard–Plawecki Right to Know Act against Defendants BHC and BCN.

Count VIV—Violations of Entitlements under the Family Medical Leave Act of 1993 against all Defendants.

Plaintiff began employment with BHC on January 5, 1998 as a bookkeeper. (Interrogatory of BHC and Bronson, No. 21). Andrew Bronson ("Bronson") was Plaintiff's direct supervisor from January 2000 until her termination. (Dep. of Bronson pg. 10–11). In early 2000, Plaintiff was promoted to Office Manager by Bronson based upon her experience, loyalty and honesty. (Dep. of Bronson pg. 15).

Around May 1, 2000 BHC and BCN entered into a contract for personnel services. (Plaintiff's Response to BHC Exh. D).[1] The Contract's terms dictated that BCN became the employer of record, and BCN was responsible for administering payroll, workers compensation benefits and maintaining personnel and human resource policies and procedures. (Plaintiff's Response to BHC Exh. D, Sec. III). BCN retained the right to hire, fire and discipline all employees under the contract. (*Id.*). BHC was responsible for day to day supervision of the employees and also had the right to hire, fire and discipline employees under limited circumstances. (*Id.* at Sec. IV). Bronson testified that his understanding of the agreement was the BHC employees became BCN employees and were leased back to BHC. (Dep. of Bronson pg. 27–28).

BHC and BCN produced an employee handbook which contained BNC's standard policies for the BHC worksite. (Dep. of Bronson pg. 33–34; Plaintiff's Response to BHC Exh. G). The BHC–BCN produced handbook provides for FMLA leave and does not provide for a separate pregnancy leave policy. (Plaintiff's Response to BHC Exh. G, Employee Handbook at 12.). The employee handbook also addressed sexual harassment and discrimination, in language provided by BCN. (Dep. of Bronson pg. 24).

Around January 2001, Plaintiff alleges that Bronson's sex harassment began. Specifically, Plaintiff's allegations against Bronson consist of the following:

1. January 2001, Bronson and Plaintiff drove to an overnight seminar. Bronson informed Plaintiff that he was interested in a personal relationship with her, but it was a double edged sword because of their work relationship. Plaintiff stated she was unwilling to take that chance because of the value of her job and her daughter. (Dep. of Russell pg. 84). Bronson's testimony states she did not give a definitive answer, but when pressed Bronson did indicate that Plaintiff told him she wanted a work relationship only. (Dep. of Bronson pg. 64). Upon reaching the seminar, Bronson had only reserved one room for the both of

---

**1.** In April 2003, BCN employed approximately 2000 employees, and during the year prior to Plaintiff's termination BCN employed more than 50 employees in the Washtenaw County area. (Dep. of Millspaugh pg. 14–17 Plaintiff's Response to BHC Exh. E; BCN's Request to Admit No. 1,4 Plaintiff's Response to BHC Exh. F).

them. (Dep. of Russell pg. 84). Bronson claims it was Plaintiff's idea to share one room. (Dep. of Bronson, pg. 61–62). Plaintiff testified, however, that if they had that conversation about sharing one room, she would not have gone to the seminar. (Dep. of Russell, pg. 86). Further a former employee of BHC, Kristine Fuciarelli BHC testified that she reserved two rooms, one for Plaintiff one for Bronson, and at no time did Plaintiff suggest that she book only one room. (Aff. of Fuciarelli, ¶ 3(a), Exh. H attached to Plaintiff's Brief in Opposition to BHC). She further testified that neither she or Plaintiff contacted the hotel to cancel the reservation and request only one be booked. *Id.* Thereafter, she testified that Plaintiff called her very upset and informed her that Bronson had cancelled one of the booked rooms. *Id.* Plaintiff testified she was very distraught about having to share one room with Bronson. (Dep. of Russell, pg. 83).

2. In February 2001, Bronson asked Plaintiff to go on a cruise in which they would share a cabin which Plaintiff refused. (Dep. of Bronson, pg. 71–73; Dep. of Russell pg. 208–209). Plaintiff testified she refused because she did not want to share a cabin with Bronson. (Dep. of Russell pg. 208–209). Plaintiff further testified that Bronson still sent her on the cruise but became upset when he learned she was taking her boyfriend. (Dep. of Russell pg. 209, 211; Dep. of Bronson, pg. 73). Plaintiff testified she again explained to Bronson she was not interested in him. (Dep. of Russell, pg. 211).

3. At this point, Plaintiff states that Bronson began to treat her differently from other employees by imposing unreasonable and last minute deadlines and forcing her to work late and on weekends. (Dep. of Russell, pg. 210; Aff. of Fuciarelli ¶ 3(c), Exh. H attached to Plaintiff's Brief in Opposition to BHC).

4. Plaintiff states that Bronson often called her after work to inquire about her personal life or to ask for dates. (Dep. of Russell, pg. 93, 95, 96.) Plaintiff further states that Bronson also stopped by her home and would call to ask where she was. (*Id.*). Plaintiff testified after these calls and visits, she feared going home. (*Id.* at 93, 95, 195). Bronson denied asking who she was with, but thought it was possible he could have called her from outside her home asking where she was. (Dep. of Bronson, pg. 87–88).

5. Bronson sent flowers and a card to Plaintiff in June, 2001. (Dep. of Bronson, pg. 77–78)

6. Bronson often massaged Plaintiff's shoulders without her permission. (Dep. of Russell, pg. 98). Bronson testified that he gave massages to other employees, male and female as well. (Dep. of Bronson pg. 77–78.)

7. Bronson invited Plaintiff to go to his cottage several times, but Plaintiff always refused. (Dep. of Bronson, pg. 80–81). On one occasion, Bronson radioed Plaintiff on BHC's speaker phone to tell her he wished she could enjoy the cottage with him. (*Id.* at 88–89). Plaintiff again told Bronson she only wanted a business relationship with him, and his comments over the speaker phone made her uncomfortable. (Dep. of Russell pg. 195–196; Aff. of Russell at ¶ 2, Exh. I to Plaintiff's Brief in Opposition to BHC; Dep. of Bronson, pg. 90–91).

8. Bronson told Plaintiff's father that he was interested in her and would

take good care of her. (Dep. of Russell, pg. 212–213; Dep. of Bronson, pg. 85–86).

9. Bronson became angry when he learned that Plaintiff was attending a rock concert with her ex-husband. (Aff. of Russell at ¶ 3; Aff. of Schroeder, at ¶ 3, Exh. J attached to Plaintiff's Brief in Opposition of BHC). After the concert, Bronson told Plaintiff to dump her ex husband because he would take better care of her and her daughter. *Id.*

Plaintiff admits that Bronson never kissed or tried to kiss her or made comments about her body. (Dep. of Russell pg. 88).

Plaintiff also alleges that after the harassment began in January 2001, she stated her complaints to Bronson and eventually BCN. Between January and July 2001, Plaintiff testified she continually told Bronson she was not interested in a relationship with him. (Dep. of Russell pg. 202). Plaintiff testified that fear of losing her job caused her to handle her complaint "delicately." (Dep. of Russell pg. 199).

In July 2001, Plaintiff approached BCN Client Services Specialist, Judy Malone ("Malone") about Bronson. (Dep. of Russell pg. 135; Dep. of Malone pg. 7). Malone was BHC's customer service representative and part of its human resource department. (Dep. of Malone pg. 7; Dep. of Bronson pg. 41). Plaintiff claims she told Malone:

A. I told her that Andrew had asked me on the way to the seminar about having a relationship with me. I told her about the room. I told her about everything that had been going on.

Q. What's everything?

A. The phone calls…The phone calls stating that he was sitting outside of my home mailbox, the phone calls telling me—asking where I was, the flowers, ·the card, asking me to go up north. What else? That's all I can remember right now. But we discussed it, and how' I should handle it. She suggested that I write a letter to Mr. Bronson so that I had something in writing and she told me that I needed to come to a determination on continuing working there, whether I could accept this and go on.

Dep. of Russell pg. 135–136.

Malone testified that Plaintiff told her that she wanted to handle it herself, and she did not want to get the human resources people involved. (Dep. of Malone pg. 18). Plaintiff did write a letter dated July 29, 2001 as Malone requested. (BCN's Motion Exh. F). The Plaintiff characterizes the letter as a complaint of harassment and disparate treatment of her, whereas Defendants contend that it clearly is not. Plaintiff wrote a similar letter dated October 9, 2001. (Plaintiff's Response to BHC Exh. M). Plaintiff testified that she again approached Malone in October 2001. (Dep. of Russell pg. 135). Malone cannot recall whether this actually occurred. (Dep. of Malone pg. 35). Bronson also denies receiving the October 9 letter. (Dep. of Bronson pg. 50).

In October 2001, BHC contracted with BDR Consulting to provide consulting services to improve the financial performance of BHC. (Dep. of Bronson pg. 120). BDR conducted an investigation of BHC's office practices. BDR recommended that Bronson terminate Plaintiff. (Dep. of Russell 191; Dep. of Bronson 125). Bronson testified that "[w]hen [BDR] started going through some of the accounting stuff, they said there was some major problems and that they said [Plaintiff] wasn't doing her job and that I should fire her immediately." (Dep. of Bronson pg. 126). However, BDR's basis for this recommendation was

its inclination that Plaintiff was embezzling money from the company. (Dep. of Bronson pg. 130). Bronson testified that he did not fire Plaintiff because he trusted her but he did take away her check signing ability to protect his business from embezzlement. (Dep. of Bronson pg. 268–69, 317). Bronson, however, also testified that he is not alleging that Plaintiff actually embezzled money from BHC. (*Id.*).

In September 2002, Plaintiff informed Bronson she was pregnant and requested leave time. (Dep. of Russell pg. 25, 56; Dep. of Bronson pg. 137–138). Plaintiff testified that she and Bronson discussed her leave on two other occasions. (Dep. of Russell pg. 56). Bronson testified that he knew Plaintiff intended to take an eight week leave. (Dep. of Bronson p. 143). Bronson later told former employees Craig Reed and Shannon Armstrong that Plaintiff would be "gone" as soon as she had her baby. (Plaintiff's Response to BHC Exh. N Aff. of Reed ¶ 3; Exh. O Aff. of Armstrong ¶ 3). Bronson denies making this comment. (Dep. of Bronson pg. 138).

On February 7, 2003 Plaintiff gave birth to her daughter prematurely. (Aff. of Russell ¶ 7). Plaintiff called Bronson to inform him of her delivery, and stated she needed to start her leave early. (Dep. of Russell pg. 36, 56). Bronson responded by stating "who is going to do my payroll tomorrow?" (Dep. of Russell pg. 36). Bronson told Plaintiff he wanted her to be available in the office or by phone to assist the office staff. (Dep. of Russell pg. 36, 38–39, 158; Aff. of Fuciarelli ¶ 8). Plaintiff continued to work on-and-off during the next several weeks. Plaintiff testified that she was being forced to bring her infant into the office and work and she only wanted to be home with her prema-

ture baby. (Dep. of Russell pgs. 33, 34, 53, 54, 58, 61). Bronson denies that he forced Plaintiff to work instead of taking a leave, and claims she voluntarily returned to work. (Dep. of Bronson pg. 158).

Plaintiff did not advise anyone at BCN she was pregnant prior to the baby's birth and did not tell anyone at BCN she had a baby until a couple of weeks after the baby was born. (Dep. of Russell pg. 220). Plaintiff did contact BCN payroll specialist Karie Millspaugh to inquire about a leave. (Dep. of Russell pg. 18). Plaintiff testified that Millspaugh told her she could not take a leave because BHC employed less than 50 employees. (Dep. of Russell pg. 220). Millspaugh testified she cannot recall discussing Plaintiff's leave situation with her. (Dep. of Millspaugh pg. 32–33). Bronson also contacted BCN regarding Plaintiff's leave. (Dep. of Bronson pg. 152, 154, 155).

On March 28, 2003 approximately seven weeks after Plaintiff gave birth to her baby she was terminated. (Dep. of Bronson pg. 170). Defendants claim that she was fired for poor performance. Specifically, Defendants contend that in March 2003, Bronson consulted with another local business man to review BHC's quick books program. (Dep. of Bronson pg. 165). During his review, the consultant found "some glaring problems and some misbalances." (Dep. of Bronson pg. 166). Meanwhile, Bronson's new wife Andrea was overseeing Plaintiff's duties and noticed some significant problems. (Dep. of Bronson pg. 163, 193). Andrea Bronson discovered that Plaintiff failed to pay state taxes and properly pay Union benefits.[2] Plaintiff disputes both allegations. (Dep. of Russell pgs. 101, 102). Kristine Fuciarelli and Geri Schroeder both testified that

**2.** The Union sued BHC before the Honorable Judge Friedman Case No. 04–71034, and la-

ter settled in favor of the Union.

Plaintiff regularly advised Bronson that he needed to pay state taxes. (Aff. of Fuciarelli ¶ 4(f); Aff. of Schroeder ¶ 4(d)). Further both Fuciarelli and Plaintiff testified that Bronson would recalculate the union dues so he would underpay the amount owed. (Dep. of Russell pgs. 168–170; Aff. of Fuciarelli ¶ 4(b)). Both Plaintiff and Fuciarelli advised Bronson of the demands for the correct amount. (*Id.*; Aff. of Schroeder ¶ 4(e)). Bronson also testified that Plaintiff failed to keep up with receivables, even failing to pay BHC's collection company which caused it to stop collecting on past due accounts. (Dep. of Bronson pgs. 171–173, 178–181). This claim is disputed by Plaintiff, Fuciarelli and Schroeder. (Dep. of Russell pg. 122; Aff. of Schroeder ¶ 4(c); Aff. of Fuciarelli ¶ 4(d)). Defendants also allege that Plaintiff did not advise Bronson of a lawsuit against his company until after a default judgment was entered. Plaintiff however testified she called Bronson several times about the Complaint and put it in his mailbox. (Dep. of Russell pgs. 114–115).

Presently before the Court is Defendants BHC's and BCN's Motion for Summary Judgment and BHC's Motion for Sanctions. BHC filed its revised Motion for Summary Judgment on June 28, 2004 and its Motion for Sanctions on June 25, 2004. BCN filed its Motion for Summary Judgment on June 28, 2004. Plaintiff responded to BHC on July 8, 2004 and BCN on July 27, 2004. Plaintiff responded to the Motion for Sanctions on July 28, 2004.

*DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT*

*ANALYSIS*

**A. Standard for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Fed.R.Civ.P. 56(b). Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. 2548; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed.1979)) (citations omitted). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir.1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland*

*Corp.,* 749 F.2d 1205, 1210–1211 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.,* 106 F.3d 135, 145 (6th Cir.1997); *see also Anderson,* 477 U.S. at 252, 106 S.Ct. 2505 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

## A. Joint–Employment Doctrine

■ In certain situations, two entities will be viewed as a single employer of an employee provided they meet either the "joint employment" test discussed in 29 C.F.R. § 825.106, or the "integrated employer" test discussed in 29 C.F.R. § 825.104(c)(2). Under the "integrated employer" test, multiple companies may be considered so interrelated that they constitute a single employer. *Cruz–Lovo v. Ryder System Inc.,* 298 F.Supp.2d 1248 (S.D.Fla.2003) (quoting *Armbruster v. Quinn,* 711 F.2d 1332, 1337–38 (6th Cir. 1983) and *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362 (6th Cir. 1982).) The "integrated employer" test does not apply here, and Plaintiff has not submitted evidence regarding it. The is-

sue is whether BHC and BCN are considered "joint employers" under the "joint employment" test.

■ Under the joint employer doctrine, courts determine whether one defendant has control over another company's employees sufficient to show that the two companies are acting as a "joint employer" of those employees. *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 993 n. 4 (6th Cir.1997). Factors to consider include "authority to hire, fire and discipline employees, promulgation of work rules and conditions of employment, issuance of work assignments and instructions, and supervision of employees' day-to-day activities." *EEOC v. Regency Windsor Mgmt. Co.,* 862 F.Supp. 189, 191 (W.D.Mich.1994). The *Swallows* Court stated:

> The basis of the [joint employer] finding is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

*Id.* (quoting *NLRB v. Browning–Ferris Ind. of Pennsylvania, Inc.,* 691 F.2d 1117, 1123 (3d. Cir.1982).)

Plaintiff argues that BHC and BCN are covered "employers" under the FMLA under the "joint employer" doctrine. The Plaintiff argues that BCN was the employer responsible for preparing payroll and maintaining personnel policies and procedures. (Plaintiff's Response to BCN at 11.) BHC was the employer responsible for daily supervision and control of the employees. (*Id.*). Both employers re-

tained the right to discipline or terminate an employee's employment. (*Id.*) Both employers provided employee benefits— BCN provided workers compensation, disability and life insurance, and a 401(k) savings plan. (*Id.*). BHC provided health insurance. (*Id.*).

The BHC–BCN produced handbook provides for FMLA leave and does not provide for a separate pregnancy leave policy. (*Id.;* see also Exh. G, Employee Handbook at 12.) Plaintiff contends that this inclusion of the FMLA in the BHC customized policy shows that Defendants BHC and BCN intended employees to use the FMLA as the basis for pregnancy leave. (*Id.*)

Plaintiff's argue that based on the totality of the circumstances, and in light of the evidence, BCN and BHC combined, employed over fifty employees. Therefore, a joint employer relationship existed between BCN and BHC, and employees of both entities must be counted when determining coverage under FMLA. (*Id.*)

Defendant BHC does not address the "joint employer" doctrine in its brief. Defendant BHC does state that it regularly employees between ten and twenty employees depending on seasonal requirements and that this is far below the fifty employee minimum threshold of FMLA. (BHC's Brief pg. 17.). Defendant BHC also argues that even if BHC and BCN were considered to be "joint employers", the fifty employee threshold is not met because Plaintiff cannot include all of BCN's employees. (BHC's Reply pg. 1).

Defendant BCN argues that the "joint employer" doctrine is inapplicable because it did not exercise the requisite amount of control over Plaintiff. (BCN's Brief pg. 7). BCN states that BHC was solely responsible for the following:

1. the decision to hire, fire and discipline its employees;

2. for determining the working hours and schedules of its employees;

3. for determining salary, bonus and commission for its employees;

4. for determining the vacation policy, holiday schedule and tuition policy for its employees;

5. for funding its employees paychecks;

6. the duties of the BHC employees did not change when BHC engaged BCN: Plaintiff was required to become a "co-employee" of BCN by virtue of its agreement with BHC;

7. all of Plaintiff's work was performed at BHC and exclusively for the benefit of BHC.

8. BHC provided all of the necessary tools and equipment for its employees.

(BCN's Brief pg. 11.).

BCN further argues that while BCN contractually retained the right to hire and fire BHC's employees, that should not be considered dispositive because BCN never actually did so. (BCN's Reply pg. 1). BCN also argues that the joint employer doctrine should not apply because BCN was not involved in any of the Plaintiff's day to day work responsibilities. (*Id.*) BCN alleges no one at BCN knew Plaintiff was pregnant or had a baby until well after its birth and BCN was not made aware of the decision to terminate Plaintiff until after that event occurred. (*Id.*).

■ The Court first rejects BHC's argument that even if BHC and BCN were considered to be "joint employers", the fifty employee threshold is not met because Plaintiff cannot include all of BCN's employees. The Court rejects this argument because it is not applicable to these facts.

BHC cites *Burdett v. Abrasive Engineering & Technology, Inc. et al.*, 989 F.Supp. 1107 (D.Kan.1997) as support for the proposition that those employees of BCN but who are not employed by BHC cannot be considered to be "jointly" employed and cannot be counted. (BHC's Reply pg. 1). In *Burdett*, an employment agency supplied defendant with temporary employees. That is not the arrangement here. BHC misunderstands the arrangement between BHC and BCN. Here, at minimum BHC employees became co-employed by BCN. Further, Andrew Bronson testified that all BHC employees became BCN employees and were leased back to BHC. (Dep. of Andrew Bronson, pgs. 27–28). The arrangement BHC describes is where a temporary leasing or help agency supplies workers to another company. However, BCN did not provide temporary employees to BHC, rather as explained above, BHC employees became BCN employees and were leased back to BHC. Similarly, BHC cites 29 C.F.R. § 825.106(d) which describes the same scenario where a temporary help agency supplies workers to another company and is not applicable here. Thus, the Court finds that BHC's authority does not apply to these facts and does not aid us in determining whether the "joint employment" doctrine applies here.[3]

■ Now to the issue of whether BHC and BCN are considered "joint employers" under the "joint employment" test.

The joint employment issue is addressed in 29 C.F.R. § 825.106 and it states:

§ 825.106 How is "joint employment" treated under FMLA?

(b) A determination of whether or not a joint employment relationship exists is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality. For example, joint employment will ordinarily be found to exist when a temporary or leasing agency supplies employees to a second employer.

29 C.F.R. § 825.106.

Under Rule 56 all inferences of fact must be in favor of Plaintiff. Plaintiff has submitted the following factual assertions in support of its claim: that BCN was responsible for preparing payroll and maintaining personnel policies and procedures, including sexual harassment and FMLA policies, BCN provided employee benefits of workers compensation, disability and life insurance and a 401(k) savings plan, that BCN had the ultimate authority to hire, fire and discipline employees on behalf of BHC, and the leasing arrangement itself is probative evidence of the existence of a "joint employment" relationship especially given explicit reference in 29 C.F.R. § 825.106(b) and the fact that upon execution of the contract BHC employees became BCN employees.[4]

The Client Service Agreement is a good starting point for this analysis. The Client

---

3. BCN made the same observation in its Reply brief footnote 1 regarding the difference between a professional service organization like BCN and temporary agency stating "[b]ecause temporary agencies and PEO serve different roles, the joint employer analysis in a case regarding temporary agencies is not applicable." (BCN's Reply pg. 1).

4. 29 C.F.R. § 825.106(b) states that "joint employment will ordinarily be found to exist when a temporary or leasing agency *supplies*

employees to a second employer." Italics added. Here, BCN did not supply BHC with the Plaintiff, rather the arrangement occurred after Plaintiff began work. The Court notes Plaintiff became an employee of BHC on January 5, 1998. BHC and BCN signed the agreement on or about May 1, 2000 in which Plaintiff under the agreement became a BCN employee leased to BHC. (Plaintiff's brief in Opposition to BCN, pg. 2).

Service Agreement parcels out the respective duties of BHC and BCN and it states:

III. Duties and Rights of [BCN]

A. [BCN] agrees to provide the following services to Client:

1. Payment of wages as reported by [BHC].

2. Collection, reporting and payment of applicable federal, state, and local payroll taxes.

3. Administration and payment of workers' compensation insurance.

4. Completion, reporting and maintenance of payroll records.

5. Hire, fire, and discipline all employees of BCN provided to BHC.

IV. Rights and duties of BHC

A. [BHC] will be responsible for the daily supervision and direction of Employees.

B. [BHC] has the right to request the removal of Employees for good cause and with reasonable notice. . . .

I. Notwithstanding any other provision to the contrary, [BCN] and [BHC] agree that the administrative aspects of the employment of individuals for [BHC] including payment of wages shall exclusively be provided by [BCN] however . . . where necessary to control the quality of BHC's products, or to protect its business reputation, or to ensure safety of individuals within its facility, BHC may take whatever action it deems necessary to modify or control the performance of individuals employed by [BCN] operating within its facility and it may on behalf of [BCN] supervise, reprimand, suspend, terminate or otherwise discipline its employees.

(Plaintiff's Response to BHC, Exh. D).

The Contract governs the obligations between BHC and BCN. Under the Contract, BHC employees became BCN employees. Further, BCN had the ultimate authority to hire, fire and discipline employees. Importantly, BHC could only fire employees under certain conditions outlined as follows:

the parties to this agreement specifically agree that where necessary to control the quality of Client's products, or to protect its business reputation, or to ensure the safety of individuals within its facility [BHC] may take whatever action it deems necessary to modify or control the performance of individuals employed by [BCN] operating within its facility and it may on behalf of [BCN] supervise, reprimand, suspend, terminate or otherwise discipline its employees.

(*Id.*).

As discussed at oral argument, none of those conditions are applicable here. Thus, under the express terms of the Contract the termination of Diana Russell was the sole responsibility of BCN. The Court finds that the "joint employment" doctrine does not absolve BCN of this responsibility.

BCN's ultimate authority to hire, fire and discipline employees is corroborated by Andrew Bronson's testimony as follows:

Q. That was your understanding that BCN did maintain that right to hire and fire and discipline its employees?

A. They are ultimately the employer of record, so yes, that is their burden.

(Deposition of Andrew Bronson, pg. 29, Exh. A of BCN's Motion for Summary Judgment)

The duties of BCN was confirmed in Andrew Bronson's deposition as stated below:

Q. And BCN was also responsible for maintaining personnel files, correct?

A. That's correct.

Q. And they were responsible for maintaining human resource policies and procedures?

A. That's correct.

Q. Subsequent to the agreement with BCN, May 1, 2000, you did not maintain a human resources department at Bronson?

A. Well, our administrative people, Steve Graves did it and whatever duties that Steve Graves gave Diana or other subordinates, okay.

Q. Okay. But human resources upon your agreement with BCN, BCN took over human resources duties, right?

A. Yes.

(Dep. of Andrew Bronson, pg. 29).

BCN cites *Cruz–Lovo v. Ryder System, Inc.*, 298 F.Supp.2d 1248 (S.D.Fla.2003) and *Astrowsky v. First Portland Mortgage Corp.*, 887 F.Supp. 332 (D.Me.1995) in support of its argument that it is not a "joint employer" of Plaintiff.

In *Cruz*, the plaintiff brought its FMLA claim against the Credit Union and Ryder Systems. The plaintiff was an employee of the Credit Union, and the Credit Union contracted with Ryder for processing its payroll, providing employee benefits and access to its human resource department. The Credit Union employed twenty employees whereas Ryder is a large company who has "hundred if not thousands of employees." *Id.* at 1249. The plaintiff alleged that both Ryder and the Credit Union were her "employers" within the meaning of the FMLA. *Id.* The court ruled that no "joint employment" relationship existed between Ryder and the Credit Union because Ryder did not exercise sufficient control over the Credit Union's employees. Thus, plaintiff's claim was dismissed because Ryder's employees could not be counted and plaintiff failed to meet the fifty employee threshold of the FMLA.

In *Astrowsky,* plaintiff, a loan officer was employed by First Portland as an independent contractor. The IRS subsequently issued a determination that plaintiff was an "employee" of First Portland for tax purposes. Consequently, plaintiff and other loan officers became leased employees of First Portland through Atlanta Staff Management. Plaintiff was later terminated and sued under among other causes of action, FMLA and Title VII. At all times, First Portland employed "nine or ten employees." *Id.* at 333. The Court used the "Title VII as a base because if the head count is insufficient to establish jurisdiction under Title VII it will likewise be insufficient under ADEA, the federal Family Medical Leave Act or the Maine Family Medical Leave Act." *Id.* at 335. The Court determined that there was no "joint employer" relationship between First Portland and Atlanta Staff Management because Atlanta Staff Management did not exercise any control over plaintiff. The Court stated that plaintiff merely had to "sign up" with Atlanta Staff Management because of the IRS determination. *Id.* at 336. All of the terms of plaintiff's employment were set out in his contract with First Portland including his commission rate, daily work schedule and vacation benefits. *Id.* The Court concluded that in the absence of any control no meaningful employment relationship existed between First Portland and Atlantic Staff Management. *Id.* Thus, no joint employer relationship existed between them. *Id.*

The Court notes several facts in favor of BCN, namely that BCN was not involved in any of the Plaintiff's day to day work responsibilities. No one at BCN knew Plaintiff was pregnant or had a baby until well after its birth and BCN was not made aware of the decision to terminate Plaintiff

until after that event occurred. BCN did not actually hire or fire Plaintiff.

However, it was BCN's responsibility to hire, fire and discipline Plaintiff and the other employees. Further, unlike the situation in *Astrowsky* where the defendant hired the employment agency for tax purposes, here BHC used BCN for the services it provided. Andrew Bronson stated in his deposition that the reason he entered into the agreement with BCN and it is as follows:

> I didn't feel the personnel I had, which it was Diana could handle the human resources and the payroll effectively, and was hoping to get, by doing this, could provide other avenues of work that can be done in other functions that need to be done at Bronson Heating & Cooling that this alleviated one function and allowing for more productivity...It provides structure of human resources...such as a safety manual, company manuals and making it more of a corporation atmosphere instead of a ma and pop heating and cooling company.

(Dep. Andrew Bronson, pg. 24).

BCN's function was to handle problems such as Plaintiff's. The employee handbook addressed sexual harassment, FMLA and discrimination, in language provided by BCN. (*Id.*). Plaintiff did seek out BCN as the employee handbook instructed. Plaintiff did tell Judy Malone, a customer service agent, about her problems with Bronson. There is some dispute as to whether Plaintiff asked Malone not to tell anyone about it but that is not relevant to our analysis. (BCN's Reply fn 2).

The Court finds that BCN co-determines the essential terms and conditions of the employees and is a joint employer for purposes of imposing liability. As stated previously, Plaintiff submitted the follow-

ing factual assertions in support of its claim: BCN was responsible for preparing payroll and maintaining personnel policies and procedures, including sexual harassment and FMLA policies, BCN provided employee benefits of workers compensation, disability and life insurance and a 401(k) savings plan, and BCN had the ultimate authority to hire, fire and discipline employees on behalf of BHC. Given these facts, the Court finds that BHC and BCN are joint-employers under FMLA.

## B. BHC's Procedural Arguments

BHC argues that Plaintiff failed to exhaust her administrative remedies because the EEOC Charge of Discrimination puts the earliest date of discrimination as August 10, 2002, and consequently Plaintiff is limited to those incidents that occurred after that date. BHC also argues that this Court should not consider the Plaintiff's Intake Questionnaire and attached "EEOC Complaint" under Fed.R.Civ.P. 37(c)(1). BHC also argues that Plaintiff cannot pursue her sex harassment claim under Title VII because her Charge of Discrimination was not timely filed with the EEOC.[5]

■ Plaintiff argues that it included a separate EEOC Complaint that contained incidents of sex and pregnancy discrimination occurring prior to August 2002. Plaintiff also argues that incidents prior to August 2002 should be included because of the principle that the EEOC Charges should be "liberally construed to encompass all charges reasonably expected to grow out of the charge of discrimination." *Haithcock v. Frank,* 958 F.2d 671 (6th Cir.1992). Plaintiff also argues that her Hostile Work Environment Complaint was timely filed under the continuing violations doctrine because Bronson's harassment did not cease until her termination.

---

**5.** BCN makes the same allegation. (BCN's Reply pg. 2–3).

As previously stated, BHC argues that Plaintiff failed to exhaust her administrative remedies because the EEOC Charge of Discrimination puts the earliest date of discrimination as August 10, 2002, and consequently Plaintiff is limited to those incidents that occurred after that date. Plaintiff did, however, include a separate EEOC Complaint that contained incidents of sex and pregnancy discrimination and retaliation occurring prior to August 2002 (Plaintiff's Reply Exh. T). When Plaintiff was asked to describe the incidents of discrimination, Plaintiff stated "see attached complaint" and described the dates of harassment as occurring between January 2001 through March 2003. (*Id.*). Plaintiff states in her affidavit:

> On June 6, 2003, I went to the EEOC to file a Charge of Discrimination against BHC and BCN. I attached a separate EEOC Complaint to my completed intake form, and gave the form and Complaint to the EEOC representative I met with. The separate EEOC Complaint included all the discriminatory incidents that had occurred during my employment with BHC and BCN. The EEOC representative then prepared my Charge of Discrimination, based upon the information contained in the separate EEOC Complaint. It was my understanding that the separate EEOC Complaint would be included, or attached, to the Charge of Discrimination.

Aff. of Russell ¶ 9.

BHC and BCN argue that intake questionnaires and supplemental statements are not, by definition, a charge of discrimination sufficient to put the employer on notice of the potential claims against it. Therefore, Defendants argue Plaintiff's Pregnancy Discrimination Claim should be dismissed. (BCN's Reply pg. 2). BCN cites *Hadley v. Midland Steel Productions*, 1993 WL 476841 (6th Cir.1993) (unpublished) and *Bost v. Federal Express Corp.*, 372 F.3d 1233 (11th Cir.2004) to support its position. Both cases held that an intake questionnaire does not meet the requirements of a charge under 42 U.S.C. § 2000e–5(b). Further BCN claims that it did not receive the intake questionnaire when it received the Charge of Discrimination from the EEOC. (BCN's Reply pg. 2). Both parties state that these documents were not produced during discovery. (*Id.;* BHC's Reply pg. 3).

■ The Court looks to the principle that the EEOC Charge should be "liberally construed to encompass all charges reasonably expected to grow out of the charge of discrimination." *Haithcock v. Frank*, 958 F.2d 671 (6th Cir.1992). It is important to note that such charges are filed by lay complainants, and should not result in the restriction of subsequent complaints based on procedural technicalities or the failure to properly word the charge. *Id.* at 675. Plaintiff did recite incidents of sex harassment and sex and pregnancy discrimination prior to August 2002 in her Intake Questionnaire and attached complaint. To bar Plaintiffs claim based on this procedural technicality would be contrary to the spirit of the Sixth Circuit's decision in *Haithcock*. Accordingly, the Court rejects Defendants' argument.

BHC also argues that this Court should not consider the Plaintiff's Intake Questionnaire and attached "EEOC Complaint" under Fed.R.Civ.P. 37(c)(1) which states:

> a party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) or to amend a prior response to discovery as required by Rule 26(e)(2), is not unless such failure is harmless, permitted to use as evidence at a trial, at a hearing,

or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(a).

■ Plaintiff failed to disclose the Intake Questionnaire and attached "complaint" in response to Defendant BHC's and Andrew Bronson's First Set of Interrogatories for Production of Documents to Plaintiff. Plaintiff was asked to produce a copy of any documents relating to any charge, complaint or grievance filed by you or anyone on your behalf with any agency regarding the allegations set forth in your Complaint, including the Equal Employment Opportunity Commission. (BHC's Reply, Exh. D). With Rule 37 the burden of establishing harmlessness is on the party who failed to make the required disclosure. *Burton v. RJ Reynolds*, 203 F.R.D. 636, 639–640 (D.Kan.2001).

The Advisory Committee Notes to the 1993 Amendments (including Rule 37(c)(1)) strongly suggests that "harmless" involves an honest mistake on the part of a party coupled with sufficient knowledge on the other party. *Vance by and Through Hammons v. United States*, 1999 WL 455435 (6th Cir.1999) (unpublished decision), 1999 U.S.App. LEXIS 14943.

■ The Court finds that Plaintiff's failure to disclose was harmless and does not exclude this evidence under Rule 37. The Court finds that the evidence was produced in time for the Defendants to properly respond to it.

BHC also argues that Plaintiff cannot pursue her sex harassment claim under Title VII because her Charge of Discrimination was not timely filed with the EEOC. In Michigan, a plaintiff is subject to a 300 day filing period deadline. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 622 (6th Cir.1983). Plaintiff filed her Charge of Discrimination with the Michigan Department of Civil Rights and

the EEOC on June 6, 2003. (BHC's Brief pg. 7.) The Supreme Court has stated "strict adherence to Title VII's timely filing requirement is the best guarantee of evenhanded administration of the law." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980).)

■ BHC alleges that Plaintiff could not identify in her complaint nor her deposition an event that occurred after August 11, 2002 (300 days before the filing of her Charge) that comprised a part of the hostile environment she alleges. (BHC's Brief pg. 7) As result, BHC state that Plaintiff cannot maintain her Title VII hostile environment sexual harassment claim as a matter of law. Plaintiff argues hostile environment sexual harassment claim is properly brought under the continuing violations doctrine. *Alexander v. Local 496, Laborer's Int'l Union*, 177 F.3d 394, 408 (6th Cir.1999).

The Supreme Court has held that hostile work environment claims involve repeated conduct occurring over days or years. *Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Plaintiff states in her deposition that the "hostility in her office never really changed" (Dep. of Russell pg. 129). The Court could infer from Plaintiff's allegations under *Celotex* that the hostile work environment continued until her termination. Plaintiff alleges "Bronson's anger and hostility to Plaintiff, which began when Plaintiff rebuffed Bronson's overtures in 2001, never stopped, and ultimately concluded with Plaintiff's termination in March 2003, just over 60 days before Plaintiff filed her EEOC charge." (Plaintiff's Brief in Opposition to BHC pg. 15).

This is a close call because of BHC's claim that Plaintiff has failed to identify a specific event that was part of the hostile environment within the 300 day period. She did, however, testify that the hostility in her office never changed. (Dep. of Russell pg. 129). The Supreme Court held in *Nat'l Railroad* that:

> The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component act of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* at 117, 122 S.Ct. 2061.

According to *Nat'l Railroad*, Plaintiff must identify an act that contributed to the hostile environment claim. BHC argues that Plaintiff has failed to do so. BHC argues that her termination under *Nat'l Railroad* constitutes a separate and discrete action and should not be considered part of her hostile environment claim. (BHC's Brief pg. 4). BHC further argues that Plaintiff characterized the termination as retaliation not as part of a hostile environment in her complaint. (*Id.*). The Supreme Court has stated "[h]ostile environment claims are different in kind from discrete acts. Their very nature involved repeated conduct." *Id.* at 116, 122 S.Ct. 2061. However, Plaintiff argues that the hostile environment never stopped and eventually culminated with her termination. (Plaintiff's Response to BHC pg. 15). BCN also argues that the "hostility" Plaintiff now claims occurred post-July 2001 is simply that Bronson did not talk to her or ignored her phone calls, and these

actions did not constitute sexual harassment. (BCN's Reply pg. 2).

*Nat'l Railroad* holds that as long as an act contributing to the claim occurred within the filing period, the entire time period of the hostile environment may be considered by the Court for purposes of determining liability. Plaintiff's allegations by themselves may not be sexual harassment, but *Nat'l Railroad* only requires that an act contributing to the claim contributes to the hostile environment within the filing period. *Id.* at 117, 122 S.Ct. 2061. Plaintiff states in her deposition that the "hostility in her office never really changed" and that "Bronson ignored her." (Dep. of Russell pg. 129). Further, Plaintiff alleges that the harassment eventually culminated with her termination. The Court finds that these allegations, particularly Plaintiff's termination constitute an act within the 300 days as required under *Nat'l Railroad*. Accordingly, the Court holds that her Title VII hostile environment sex harassment claim was timely filed, and denies summary judgment on that count.

### 2. FMLA Interference Claim

The Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*, ("FMLA") provides, in part, an employee with 12 weeks of leave due to the birth of a child, a serious health concern, or to care for a family member with a serious health condition. *Id.* at § 2612. Upon returning from leave under the FMLA, an employee is entitled to be restored to their former position or to an equivalent position with equivalent benefits, pay, and other terms of employment. 29 U.S.C. § 2614. The FMLA provides:

> Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the

leave shall be entitled, on return from such leave -

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

26 U.S.C. § 2614.

■ To establish an interference claim, the employee must show that (1) she is an "eligible employee", (2) the defendant is a covered "employer", (3) the employee was entitled to FMLA leave, (4) the employee notified the employer of the need for leave, and (5) the employer denied the employee FMLA benefits. *Cavin v. Honda of America Manufacturing Inc.*, 346 F.3d 713, 716 (6th Cir.2003).

BCN argues that Plaintiff has suffered no damages, therefore her interference claim fails. BCN states that Plaintiff was paid full salary and benefits during the time she claims to have been entitled to FMLA. (BCN's Brief pg. 19).

■ Plaintiff counters that she was on partial leave following her delivery. (Dep. of Russell pg. 63). Plaintiff claims that Defendants failed to restore her to the same or equivalent position following the conclusion of her partial leave. Plaintiff states that if an employer interferes with FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred. *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir.2003). Plaintiff states that it is undisputed that Defendants terminated her just days before she was scheduled to resume full time employment. (Plaintiff's Response to BHC pg. 11).

The Court finds that Plaintiff has established enough evidence to survive summary judgment on her FMLA Interference Claim. Plaintiff claims that she was terminated just days before she was scheduled to resume full time. Therefore, Defendants' failed to restore her to the same or equivalent position at the conclusion of her "partial leave." Plaintiff testified she was on partial leave following her delivery. (Dep. of Russell pg. 63). BCN argues that even if Plaintiff states a viable interference claim, she has not suffered any compensable damages as a result of the alleged violation. (BCN's Motion pg. 18). However, Plaintiff argues that Defendants failed to restore her to the same or equivalent position by firing her, therefore she has suffered economic loss. Taking the evidence most favorable to Plaintiff, the Court finds that Plaintiff has sufficient evidence to create a question of fact as to her interference claim as to BHC and BCN under the FMLA.

## D. FMLA Retaliation Claim

■ To establish a prima facie case of retaliation under the FMLA, Plaintiff must show: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse employment action or was subjected to severe or pervasive retaliatory harassment by a supervisor; (3) the employment action or harassment was casually related to the protected activity. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir.2001).

Under Michigan and Federal law, where there is no direct evidence to establish a question of fact on discriminatory intent, Courts turn to the *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden shifting framework. Under *McDonnell Douglas* a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas* 411 U.S. at 802, 93 S.Ct.

1817; *Dubey v. Stroh Brewery Co.*, 185 Mich.App. 561, 462 N.W.2d 758 (1990). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must then prove that the reason put forth by the defendant was a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

■ Plaintiff argues that it can establish a prima facie case for FMLA Retaliation claim. Plaintiff claims she requested leave and gave sufficient notice under the act when she called Bronson two days after giving birth. (Plaintiff's Brief in Opposition to BCN pg. 12). Plaintiff also states that she can establish a causal connection because of the temporal proximity of her firing and the birth of her baby (seven weeks) and because of Bronson's statement that "she would be gone as soon as she had the baby." *Id.*

BCN [6] claims that because Plaintiff did not request a FMLA leave, her FMLA retaliation claim is not actionable. Further, her allegations against BCN are that it did not support her or direct her to the right places. (Dep. of Russell pg. 221). BCN claims that this is not enough to hold it liable for retaliation. (BCN's Reply pg. 5).

The Court finds sufficient evidence for Plaintiff to survive Summary Judgement as to both Defendants pursuant to the discussion below.

The Court finds that Plaintiff has brought a prima facie case sufficient to survive Summary Judgment. Plaintiff has established that she requested leave to Bronson. (Dep. of Russell pg. 56). Although she did not specifically mention the

FMLA, Defendant could reasonably conclude FMLA leave was required. *Brohm v. JH Props., Inc.*, 149 F.3d 517, 523 (6th Cir.1998). As to the third prong (material adverse employment action), Plaintiff was terminated approximately seven weeks after she requested her leave to Bronson. Additionally, Bronson stated that Plaintiff would be "gone as soon as she had her baby." Plaintiff argues that the temporal proximity combined with Bronson's statement is sufficient to survive summary judgment.

Further, the Court rejects BCN's argument that it should not be liable based upon Plaintiff's allegation that it did not direct her to the right places. The human resource arena was BCN's responsibility. BCN's failure to act or meet its obligations will not shield it from liability. Accordingly, the Court denies Summary Judgment on this count.

**E. Bronson's Individual liability under Title VII**

Plaintiff argues that individual liability attaches to Andrew Bronson because he is the "alter ego" of BHC. Plaintiff states that was the president and sole shareholder of BHC and exercised significant control over Plaintiff's employment, therefore pursuant to *Curcio v. Chinn Enterprises, Inc.*, 887 F.Supp. 190 (N.D.Ill.1995) individual liability should attach.

■ It is well settled that individual liability does not attach to individual supervisors under Title VII. Although the United States Supreme Court has not considered the issue of individual liability under Title VII, there is almost complete consensus on this issue among the federal circuit courts of appeal. *See Individual Liability of Supervisors For Sexual*

**6.** BHC made no argument with the respect to this claim.

*Harassment Under Title VII: Courts' Reliance on the Rules of Statutory Construction,* 42 B.C.L. L.Rev. 421, 424 (2001).

In *Wathen v. General Electric Co.,* 115 F.3d 400 (6th Cir.1997), the Court ruled that "[a]n examination of the statutory scheme and remedial provisions of Title VII, convinces us that Congress did not intend to provide for individual employee/supervisor liability under Title VII." *Id.* at 405. The Court found that the statutory scheme of limiting liability to employers with fifteen or more employees demonstrated a congressional intent not to impose liability on individuals. *Id.* The Court agreed with the Second Circuit's conclusion in *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d. Cir.1995) that it is "inconceivable that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees." *Wathen* at 406.

Plaintiff argues that individual liability attached to Andrew Bronson because he is the "alter ego" of BHC. The Plaintiff cites *Sauers v. Salt Lake County,* 1 F.3d 1122 (10th Cir.1993) to support her position. *Sauers,* however, does support the imposition of individual liability here. In *Sauers,* the court stated that the "alter ego" doctrine applies in the situation where the employer may be liable for unlawful employment practices of an individual supervisor regardless of whether the employer knew of the conduct. *Id.* at 1125. That scenario is not applicable here.

Plaintiff also argues that individual liability attached pursuant to *Curcio v. Chinn Enterprises, Inc.,* 887 F.Supp. 190 (N.D.Ill.1995). In *Curcio,* the Court found individual liability under the "alter ego" doctrine because the defendant was the president, controlling shareholder, and head of management of the corporate defendant. *Id.* at 193–94. The Court further held that in all respects, he was the actual employer because he was the main decisionmaker, and there was no other avenue for the employees to object to his misconduct. *Id.*

The Court notes that this decision has been criticized in the Seventh Circuit. The Seventh Circuit stated in dicta that an allegation that an individual was an "alter ego" of the employer "does not matter as to her individual liability." *U.S. EEOC v. AIC Sec. Investigations Ltd.,* 55 F.3d 1276, 1282 n. 11 (7th Cir.1995) In *Solon v. Kaplan,* 2001 WL 123769 (N.D.Ill.2001) (unpublished), 2001 U.S. Dist. LEXIS 1384, the Court criticized and did not follow *Curcio* stating "[b]ecause the Seventh Circuit has unequivocally rejected [defendant's] alter ego theory (albeit in dicta), the court concludes that [defendant's] reliance on *Curcio* is unpersuasive." *Id.* 2001 WL 123769, at 3, 2001 U.S. Dist. LEXIS 1384, at 10.

The Court rejects Plaintiff's alter ego theory and holds that Andrew Bronson is not individually liable under Title VII because (1) the Sixth Circuit does not allow individual liability under Title VII and does not recognize the alter ego doctrine; (2) the *Curcio* decision has not even been followed in the Seventh Circuit; (3) Congress' intent not to impose liability upon individuals under Title VII.

## F. Sex Discrimination Under Title VII and ELCRA

█ BCN alleges that Plaintiff was not replaced by a man. BCN states that she cannot identify a similarly situated individual who received different treatment than she. BCN further states that Plaintiff cannot rebut BHC's reasons for her termination. BCN also argues that even if it were deemed a joint employer, under *Williams v. Grimes Aerospace,* 988 F.Supp. 925 (D.S.C.1997) it still cannot be liable for discrimination. *Grimes* stated

that "[i]t would be grossly inequitable to hold such an agency liable for discrimination that it was not aware of, had no reason to know was taking place and had no control." *Id.* at 938. Plaintiff did not substantively address Sex Discrimination.

Under Michigan and Federal law, where there is no direct evidence to establish a question of fact on discriminatory intent, Courts turn to the *McDonnell Douglas* burden shifting framework. Under *McDonnell Douglas* a plaintiff has the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. *McDonnell Douglas* 411 U.S. at 802, 93 S.Ct. 1817; *Dubey v. Stroh Brewery Co.,* 185 Mich.App. 561, 462 N.W.2d 758 (1990). If plaintiff succeeds in establishing a prima facie case, the burden shifts to defendant to articulate some nondiscriminatory reason for the adverse action. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff must then prove that the reason put forth by the defendant was a mere pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817.

The Court grants BHC's and BCN's Motion for Summary Judgment on this count because Plaintiff fails to make a prima facie showing of sex discrimination under both Title VII and ELCRA. Plaintiff cannot identify a similarly situated individual who received different treatment than she. Plaintiff does not allege that she was replaced by a man after she was terminated. Accordingly, the Court finds that Plaintiff fails to provide sufficient allegations to support a prima facie case for sex discrimination.

## G. Title VII Pregnancy Discrimination Claim

A plaintiff can establish a prima facie case of unlawful pregnancy discrimination by demonstrating (1) she was pregnant; (2) she was qualified for her job; (3) she was subjected to an adverse employment decision; and (4) there is a nexus between the pregnancy and the adverse employment decision. *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 658 (6th Cir.2000). Under the *McDonnell Douglas* framework which applies here, Plaintiff bears the initial burden of establishing a prima facie case of retaliation, the burden shifts to Defendants to articulate a legitimate, [*632] nondiscriminatory reason for the adverse action, then Plaintiff must show that Defendant's nondiscriminatory reason is a pretext designed to mask discrimination. *Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d 309, 316 (6th Cir.2001).

BHC argues that Plaintiff's Pregnancy Discrimination Claim fails as a matter of law. BHC contends that in this case, there is no evidence that her termination was related to her pregnancy and that it is undisputed that she was discharged after her pregnancy ended. (BHC's Brief pg. 8.)

Plaintiff argues that Bronson's statement that "she would be gone as soon as she had the baby" constitutes direct evidence of pregnancy discrimination. (Plaintiff's Response to BHC pg. 19). Plaintiff also states that she can also establish her claims circumstantially under *McDonnell Douglas* primarily because of Bronson's statement and the fact she was terminated.

BHC cites *Fleming v. Ayers & Assoc.,* 948 F.2d 993, 996–97 (6th Cir.1991) for the proposition that the prohibition against pregnancy discrimination does not extend to once the child is born. BHC contends that in this case, there is no evidence that her termination was related to her pregnancy and that it is undisputed that she was discharged after her pregnancy ended. (BHC's Brief pg. 8.)

Plaintiff on the other hand argues that it need not prove that the adverse employment action occurred during the pregnancy, rather because of the pregnancy. (Plaintiff's Response to BHC pg. 20 citing *Cline* at 658). The Court finds that Plaintiff is correct. The *Fleming* case cited by BHC is distinguishable. *Fleming* held that where plaintiff is terminated due to increased medical costs associated with plaintiff's newborn, Title VII protections do not apply because they do not encompass adverse employment actions based upon the medical condition of the child. Here, unlike in *Fleming*, Plaintiff alleges she was fired because of her pregnancy.

■ Plaintiff also argues that she has stated a prima facie case of pregnancy discrimination. Plaintiff states that she can present her evidence directly or circumstantially pursuant to *Johnson v. Kroger*, 319 F.3d 858 (6th Cir.2003). Plaintiff contends that Bronson's statement to other employees indicating she "would be gone as soon as she had the baby" constitutes direct evidence of pregnancy discrimination. (Plaintiff's Response to BHC pg. 19; see also Exh. N. Aff. of Reed ¶ 3 and Exh. O. Aff. of Armstrong at ¶ 30.). Plaintiff argues that this comment "compels the conclusion that Plaintiff's discharge, just seven weeks after Plaintiff gave birth, was motivated, at least in part, by an animus against pregnant women." (Plaintiff's Response to BHC pg. 19). Plaintiff further states that she can easily establish her claims circumstantially pursuant to *McDonnell Douglas*. Plaintiff states that she was pregnant, she was qualified for the job, she was subject to an adverse employment decision (her termination) and there was an nexus between the termination and her pregnancy. Plaintiff contends that Bronson's statement above is direct evidence of that nexus. BHC contends that "[a]ll the statement tends to show is when

Defendant Bronson anticipated terminating Plaintiff's employment, which did occur after she had given birth, not the reason for terminating her employment." (BHC's Reply pg. 5). BHC's assertion is one inference to be drawn from the statement. However, Plaintiff alleges that this statement demonstrates a discriminatory motive to fire Plaintiff. Under Rule 56, all inferences of fact must be in favor of the non-moving party, here Plaintiff. Accordingly, the Court finds that this creates a question of fact for the jury to decide.

The Plaintiff has brought forth evidence to dispute BHC's alleged non-discriminatory reasons for firing her. BHC claims Plaintiff was fired for poor performance. Specifically, BHC contends that in March 2003, Bronson consulted with another local business man to review BHC's quick books program. (Dep. of Bronson pg. 165). During his review, the consultant found "some glaring problems and some misbalances." (Dep. of Bronson pg. 166). BHC also claims that Bronson's wife Andrea was overseeing Plaintiff's duties and noticed some significant problems. (Dep. of Bronson pg. 163, 193). Andrea Bronson discovered that Plaintiff failed to pay state taxes and properly pay Union benefits. Plaintiff disputes both allegations. (Dep. of Russell pgs. 101, 102). Kristine Fuciarelli and Geri Schroeder both testified that Plaintiff regularly advised Bronson that he needed to pay state taxes. (Aff. of Fuciarelli ¶ 4 (f); Aff. of Schroeder ¶ 4 (d)). Further both Fuciarelli and Plaintiff testified that Bronson would recalculate the union dues so he would underpay the amount owed. (Dep. of Russell pgs 168–170; Aff. of Fuciarelli ¶ 4 (b)). Both Plaintiff and Fuciarelli advised Bronson of the demands for the correct amount. (*Id.;* Aff. of Schroeder ¶ 4 (e)). Bronson also testified that Plaintiff failed to keep up with receivables, even failing to pay BHC's collection company which caused it to stop collecting

on past due accounts. (Dep. of Bronson pgs 171–173, 178–181). This claim is disputed by Plaintiff, Fuciarelli and Schroeder. (Dep. of Russell pg. 122; Aff. of Schroeder ¶ 4 (c); Aff. of Fuciarelli ¶ 4 (d)). Defendants also allege that Plaintiff did not advise Bronson of a lawsuit against his company until after a default judgment was entered. Plaintiff however testified she called Bronson several times about the Complaint and put it in his mailbox. (Dep. of Russell pgs. 114–115). The Court finds that Plaintiff has brought forth enough evidence to create a question of fact that BHC's non-discriminatory reasons are a pretext designed to mask discrimination. *Skrjanc* at 316.

In deciding a summary judgment motion, the Court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210–1211 (6th Cir.1984). The Court finds that under this standard, it can be reasonably inferred that Bronson's statement was motivated to fire Plaintiff because she was pregnant. Plaintiff has also submitted enough evidence to show she was pregnant, she was qualified for the job, she was subject to an adverse employment decision (her termination) and there was an nexus between the termination and her pregnancy (Bronson's statement). Accordingly, the Court holds that Plaintiff has introduced "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir.1997). Accordingly, BHC's motion for summary judgment on the Pregnancy discrimination claim is denied.

Similarly, as previously stated, the employment practices of BHC were BCN's responsibility. BCN's failure to monitor or act appropriately will not absolve it of liability. Accordingly, the Court denies Defendants' motions for Summary Judgment on this count.

## H. Retaliation under Title VII and the ELCRA

■ The ECLRA and Title VII prohibit employers from retaliating against an employee for utilizing rights under Title VII and the ELCRA. To establish a retaliation claim, a plaintiff must show (1) she engaged in statutorily protected activity; (2) defendant knew she engaged in the activity; (3) she suffered an adverse employment action or was subjected to retaliation by a supervisor; and (4) the adverse action or harassment was causally related to the protected activity. *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir.2004).

Under the *McDonnell Douglas* framework, Plaintiff bears the initial burden of establishing a prima facie case of retaliation, the burden then shifts to Defendants to articulate a legitimate, [*632] nondiscriminatory reason for the adverse action, then Plaintiff must show that Defendant's nondiscriminatory reason is a pretext designed to mask discrimination. *Skrjanc v. Great Lakes Power Service Co.*, 272 F.3d 309, 316 (6th Cir.2001).

Plaintiff argues that she has established a prima facie case for retaliation. Plaintiff argues she has established the first element of "protected activity" by virtue of her expression of a reasonable belief that Bronson engaged in discriminatory employment practices based on unlawful considerations, including sex. (Plaintiff's Brief pg. 18).[7] Here, Plaintiff states that her complaint to Bronson and Malone fall into this category. *Id.*

Under the second element, Plaintiff states that Bronson admitted he was

---

7. Plaintiff cites *Holden v. Owens–Illinois, Inc.*, 793 F.2d 745 (6th Cir.1986).

aware Plaintiff was complaining of harassment in July 2001, therefore Bronson knew she engaged in protected activity.

Under the third element, Plaintiff argues that the Court should consider "unique" indices when considering an adverse employment action. *White v. Burlington Northern Santa Fe R. Co.* 364 F.3d 789, 799 (6th Cir.2004). Plaintiff states that after July, 2001 Bronson began to treat her disparately from other employees. Plaintiff states Bronson ignored her in the office, and after she complained in October 2001, he removed her check signing ability, a responsibility unique to her position as office manager. (Plaintiff's Brief pg. 18). Plaintiff argues that despite the fact she was terminated months after her complaints, she was a "target" of retaliation, and therefore has established the fourth element of causation. Plaintiff contends that Bronson's intervening hostile and retaliatory behavior continued unabated and demonstrates that Plaintiff was a target of retaliation sufficient to withstand summary judgment.

BCN primarily argues that the length of time between the "complaint" and the termination is too remote to allow for an interference of causation. (BCN's Brief pg. 17). BCN states even loose temporal proximity between the timing of the protected activity and adverse employment action is not sufficient to create a triable issue. BCN cited *Hafford v. Seidner,* 183 F.3d 506, 515 (6th Cir.1999). BCN also argues that because it did not have knowledge or play a role in the termination, the allegations fail as to them.

BHC argues that Plaintiff cannot establish any elements of a *prima facie* case for retaliation under Title VII. BHC first states that her complaint to Judy Malone in October 2001 was not protected activity because none of her expressions indicated she was experiencing sexual harassment in violation of Title VII. BHC also argues that taking away a job responsibility does not qualify for an adverse employment action as required by the third element. (BHC's Brief pg. 10). Lastly, BHC argues that Plaintiff's termination was not related to any protected activity. (*Id.* at 11).

BHC argues that Plaintiff cannot establish any elements of a *prima facie* case for retaliation under Title VII. BHC first states that her complaint to Judy Malone in October 2001 was not protected activity because none of her expressions indicated she was experiencing sexual harassment in violation of Title VII. However, the Court finds that the record shows sufficient evidence for the Plaintiff to satisfy this element. Plaintiff wrote a letter to Bronson in July, 2001 in which Bronson stated that the letter included allegations of sexual harassment. (See Exh. L 7/29/01; see also Dep. of Bronson pg. 43, 48, 49). Further, Plaintiff contacted Malone and indicated Bronson has made unwelcome advances and was treated her differently. (Dep. Of Malone pg. 12–13, 14–16, 20, 21). The Court finds that this activity falls into protected activity.

The Court finds that Plaintiff's retaliation claim as to Title VII fails as the third and fourth elements. Plaintiff alleges that Bronson retaliated against her by ignoring her and taking away her check signing abilities. The Sixth Circuit has said an adverse employment action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. It must be a condition such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Kocsis v. Multi–Care Management, Inc.,* 97 F.3d 876, 886 (6th Cir.1996).

The Court finds that Plaintiff's loss of the ability to sign checks did diminish her job responsibilities. However, the Court finds it did not significantly diminish a material responsibility. Further, Plaintiff did not experience a loss in pay, benefits or job title. The Court finds that Plaintiff's allegations taken as true, are not an "adverse employment" action under the third element. Further, Plaintiff has not presented evidence to support that her termination a year-and-a-half after her complaint was casually connected to her complaints. The Court finds that Plaintiff's argument that there is causation because she was a "target" of retaliation is unavailing.

Plaintiff cites *Little v. BP Exploration*, 265 F.3d 357, 365 (6th Cir.2001) to support its claim. In *Little*, the Court found there was sufficient evidence to create a genuine issue of material fact as to the causation element because plaintiff's affidavits showed that he was disciplined for failing to wear his uniforms, while other employees not wearing their uniforms were not. *Id.* at 363. Plaintiff further showed that he was told by fellow employees that they were instructed to make false claims of theft and harassment against him or be terminated. *Id.* The Court found that the temporal proximity (one year after first

EEOC complaint, 3 months after second) combined with the evidence above showing retaliatory conduct, was sufficient to survive summary judgment. *Id.* at 364. Here, Plaintiff's allegations of Bronson ignoring her and the loss of check writing ability are not to the level of the retaliatory acts in *Little*. Thus, given the temporal proximity between Plaintiff's complaint and the lack of an "adverse employment" action, the Court grants BHC's and BCN's motion for summary judgment regarding Plaintiff's Title VII and ELCRA retaliation claims.[8]

I. Title VII and ELCRA Hostile Work Environment Claim

 Title VII and the ELCRA prohibit "hostile work environment" harassment. A plaintiff can establish a Title VII violation by proving that discrimination based on sex created a hostile or abusive work environment.[9] *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

 To establish a hostile work environment claim, an employee must show: (1) she is a member of a protected class; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on the person's sex; (4) the harassment

---

8. For Plaintiff to establish a prima facie case under the ELCRA, which is virtually identical to Title VII she must show (1) that the plaintiff engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Meyer v. City of Center Line*, 242 Mich.App. 560, 568–569, 619 N.W.2d 182 (2000). BHC argues that further that Plaintiff cannot establish the second prong, namely that Defendant BHC had notice of Plaintiff's complaining of sexual harassment. The ELCRA retaliation claim is better decided based on prongs (3) and (4) as explained above.

9. The following analysis applies to Plaintiff's ELCRA claim equally because the ELCRA is virtually identical to Title VII and Michigan courts find federal precedent highly persuasive in ELCRA claims. *Meyer v. City of Center Line*, 242 Mich.App. 560, 569, 619 N.W.2d 182 (2000). Although the Court notes that there is a split between *Williams v. General Motors Corp.*, 187 F.3d 553, (6th Cir.1999) and *Corley v. Detroit Board of Education*, 470 Mich. 274, 681 N.W.2d 342 (2004) regarding whether the conduct must be sexual in nature as discussed below.

created a hostile work environment; (5) the employer failed to take reasonable precautions to prevent and correct any sexually harassing behavior. *Williams v. General Motors Corp.*, 187 F.3d 553, 560–561 (6th Cir.1999).

Defendants attack Plaintiff's claim on two fronts. First, they argue that Bronson's conduct was insufficiently pervasive or severe, and therefore did not create a hostile work environment. Second, Defendants argue that they had insufficient notice to establish respondent superior liability. BCN separately makes a related claim that it should be absolved from liability under the *Burlington* affirmative defense.

### a. Pervasive or severe harassment under Title VII and ELCRA

The Supreme Court stated in *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) that harassing conduct must be judged both objectively and subjectively. This means it must be pervasive enough to create an environment that a reasonable person would find hostile, and the victim must subjectively regard the environment as hostile. *Id.* at 21–22., 114 S.Ct. 367

The Court then provided a non-exhaustive list of factors to consider when determining whether a particular environment was objectively hostile:

> [T]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant fac-

tor, may be taken into account, no single factor is required.

*Id.* at 23, 114 S.Ct. 367.

Justice Scalia writing for an unanimous Court in *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) stated:

> The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale* at 83, 118 S.Ct. 998 as quoted in *Williams* at 562.

Plaintiff argues that it can establish that Bronson's unwelcome advances, which would not have occurred but-for Plaintiff's gender, were sufficiently severe and pervasive under both the objective and subjective tests. (Plaintiff's Brief in opposition to BHC. pg. 17).

Plaintiff's allegations against Bronson consist of the following:

1. January 2001, Bronson and Plaintiff drove to an overnight seminar. Bronson informed Plaintiff that he was interested in a personal relationship with her, but it was a double edged sword because of their work relationship. Plaintiff stated she was unwilling to take that chance because of the value of her job and her daughter. (Dep. of Russell pg. 84). Bronson's testimony states she did not give a definitive answer, but when pressed Bronson

did indicate that Plaintiff told him she wanted a work relationship only. (Dep. of Bronson pg. 64). Upon reaching the seminar, Bronson had only reserved one room for the both of them. (Dep. of Russell pg. 84). Bronson claims it was Plaintiff's idea to share one room. (Dep. of Bronson, pg. 61–62). Plaintiff testified, however, that if they had that conversation about sharing one room, she would not have gone to the seminar. (Dep. of Russell, pg. 86). Further a former employee of BHC, Kristine Fuciarelli BHC testified that she reserved two rooms, one for Plaintiff one for Bronson, and at no time did Plaintiff suggest that she book only one room. (Aff. of Fuciarelli, ¶ 3(a), Exh. H attached to Plaintiff's Brief in Opposition to BHC). She further testified that neither she or Plaintiff contacted the hotel to cancel the reservation and request only one be booked. *Id.* Thereafter, she testified that Plaintiff called her very upset and informed her that Bronson had cancelled one of the booked rooms. *Id.* Plaintiff testified she was very distraught about having to share one room with Bronson. (Dep. of Russell, pg. 83).

2. In February 2001, Bronson asked Plaintiff to go on a cruise in which they would share a cabin which Plaintiff refused. (Dep. of Bronson, pg. 71–73; Dep. of Russell pg. 208–209). Plaintiff testified she refused because she did not want to share a cabin with Bronson. (Dep. of Russell pg. 208–209). Plaintiff further testified that Bronson still sent her on the cruise but became upset when he learned she was taking her boyfriend. (Dep. of Russell pg. 209, 211; Dep. of Bronson, pg. 73).

Plaintiff testified she again explained to Bronson she was not interested in him. (Dep. of Russell, pg. 211).

3. Around February 2001 Plaintiff states that Bronson began to treat her differently from other employees by imposing unreasonable and last minute deadlines and forcing her to work late and on weekends. (Dep. of Russell, pg. 210; Aff. of Fuciarelli ¶ 3(c), Exh. H attached to Plaintiff's Brief in Opposition to BHC).

4. Plaintiff states that Bronson often called her after work to inquire about her personal life or to ask for dates. (Dep. of Russell, pg. 93,95,-96.) Plaintiff further states that Bronson also stopped by her home and would call to ask where she was. (*Id.*). Plaintiff testified after these calls and visits, she feared going home. (*Id.* at 93, 95, 195). Bronson denied asking who she was with, but thought it was possible he could have called her from outside her home asking where she was. (Dep. of Bronson, pg. 87–88).

5. Bronson sent flowers and a card to Plaintiff in June, 2001. (Dep. of Bronson, pg. 77–78)

6. Bronson often massaged Plaintiff's shoulders without her permission. (Dep. of Russell, pg. 98). Bronson testified that he gave massages to other employees, male and female as well. (Dep. of Bronson pg. 77–78.)

7. Bronson invited Plaintiff to go to his cottage several times, but Plaintiff always refused. (Dep. of Bronson, pg. 80–81). On one occasion in June 2001, Bronson radioed Plaintiff on BHC's speaker phone to tell her he wished she could enjoy the cottage

with him. (*Id.* at 88–89). Plaintiff again told Bronson she only wanted a business relationship with him, and his comments over the speaker phone made her uncomfortable. (Dep. of Russell pg. 195–196; Aff. of Russell at ¶ 2, Exh. I to Plaintiff's Brief in Opposition to BHC; Dep. of Bronson, pg. 90–91).

8. Bronson told Plaintiff's father that he was interested in her and would take good care of her. (Dep. of Russell, pg. 212–213; Dep. of Bronson, pg. 85–86).

9. In early summer 2001, Bronson became angry when he learned that Plaintiff was attending a rock concert with her ex-husband. (Aff. of Russell at ¶ 3; Aff. of Schroeder, at ¶ 3, Exh. J attached to Plaintiff's Brief in Opposition of BHC). After the concert, Bronson told Plaintiff to dump her ex husband because he would take better care of her and her daughter. *Id.*

Plaintiff contends that under *Williams v. General Motors,* non-sexual content may be illegally sex based where it can be shown but for the employee's sex, she would not have been the object of harassment. (Plaintiff Brief in Opposition to BHC pg. 16 citing *Williams* at 565). The *Williams* Court held that "any unequal treatment of an employee that would not occur but for the employee's gender may, if sufficiently severe or pervasive under the *Harris* standard, constitute a hostile environment under Title VII." *Williams* at 565. Plaintiff contends that looking at the totality of the circumstances, and evidence in the light most favorable to Plaintiff, Bronson's interest in Plaintiff was based on his sexual attraction to Plaintiff as a women. The Court agrees with Plaintiff.

Defendants cite *Marquis v. Tecumseh Products Co.,* 206 F.R.D. 132 (E.D.Mich. 2002) to support a finding of insufficient harassment. In *Marquis,* the Court dismissed plaintiff Conrad's claim of sexual harassment. Plaintiff Conrad alleged that defendant looked her "up and down" and "watched her butt", made several comments about her hair, on a few occasions touched or squeezed her shoulder, and one incident where defendant "inappropriately approached her from behind while she bent over." *Id.* at 173. The Court held that this conduct was not sufficiently severe or pervasive. *Id.*

Plaintiff Conrad's harassment in *Marquis* is different from the present facts. Here, Plaintiff alleges that the hostility in the office was constant. (Dep. of Russell pg. 129). The Court finds that taking the evidence in a light most favorable to Plaintiff, the harassment was not limited to a few incidents as plaintiff Conrad alleged in *Marquis.*

BHC states that the alleged harassment is not severe or pervasive. (BHC Motion pg. 7). BCN similarly argues lack of severity[10] and states that the following claims by Plaintiff are insufficient:

Plaintiff claims that she suffered sexual harassment because Mr. Bronson told her that he was interested in having a personal relationship with her, gave her flowers with a card, booked one room (with two beds) in a hotel, became upset when he learned that she asked her boyfriend to go on a cruise that Mr. Bronson gave her as a gift, called her on her cell phone after working hours to inquire her whereabouts and claiming to be near her home, once told her father

---

**10.** BCN cites several cases for the proposition that the touching Plaintiff complains is not sufficiently severe to state an actionable claim. (BCN's Motion fn. 10). However, the touching alleged by Plaintiff is one of many alleged incidents of harassment.

that he was interested in pursuing a relationship with her and that he would 'take good care of her and her daughter' and because he would sometimes massage her shoulders.

BCN's Motion pg. 12.

The Sixth Circuit has addressed this issue in several cases. In *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 790 (6th Cir.2000), the Court found that the alleged harassment was not sufficiently severe or pervasive. The plaintiff alleged that the employer made a request for sexual favors from the employee for a better evaluation, called her "hot lips," made comments about her state of dress and told dirty jokes in front of her. The Court stated that "[a]lthough [employer's] purported sexual advance was truly offensive, it was the only advance that [employer] allegedly made. Most of [his] jokes were not aimed at the plaintiff, and that fact can be relied upon as part of a court's conclusion that a defendant's conduct was not severe enough to create an objectively hostile environment." *Id.* at 791. The Court also stated that to include the employer's alleged retaliatory conduct towards plaintiff would be a mistake because it was motivated entirely on personal displeasure towards plaintiff rather than because of sex. *Id.*

In *Black v. Zaring Homes, Inc.*, 104 F.3d 822 (6th Cir.1997), the Court reversed the jury verdict, and held there was insufficient evidence to objectively find a hostile work environment. The plaintiff alleged that her employer made various discriminatory comments at biweekly company meetings. Specifically, plaintiff alleged that the employer while reaching for a pastry stated "nothing I like more in the morning than sticky buns." *Id.* at 823. The employer further joked that a parcel of land next to a Hooters Restaurant be named "Hootersville" or "Titsville" or "Twin Peaks." *Id.* Plaintiff also alleged that she was told she " was paid a lot of money for a women" and that she felt uncomfortable when she was teased about her pronunciation of the word "bosom." The employer also allegedly asked plaintiff if she was at a biker bar last night dancing on tables and called her a "broad." The Court held that despite the offensive nature of these actions, they were not sufficiently pervasive to constitute a hostile work environment. The fact that most of the acts were not directed at plaintiff contributed to the Court's conclusion.

In *Burnett v. Tyco Corp.*, 203 F.3d 980, 982 (6th Cir.2000), the Court held that plaintiff failed to show her harassment was sufficiently severe to constitute a hostile work environment. Plaintiff alleged that her employer placed a pack of cigarettes under her bra strap, remarked she "lost her cherry," and after she wore a sweatshirt that read "Deck the Malls" stated "dick the malls, dick the malls, I almost got aroused." The Court noted the severity of the cigarette pack incident and stated that it might even constitute a battery. However, the Court held that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." *Id.* at 985.

These cases are distinguishable from the facts here because the decisions above were based on the fact that the most of the employers' actions were not directed at the plaintiffs. Here, all of Bronson's comments and actions were directed at Plaintiff. Further, they were based upon his romantic interest in her and therefore were based upon sex.

Plaintiff's allegations are sufficient to create a question of fact under Title VII.

As the *Williams* Court stated "the issue is not whether each incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Id.* at 563. Here, Plaintiff's allegations of Bronson's continued harassment based upon his romantic interest in her constitute conduct which a reasonable person in her position would find severely hostile.

Defendants state that Bronson was not physically threatening. Plaintiff admits that Bronson never kissed or tried to kiss her or made comments about her body. (Dep. of Russell pg. 88). With respect to Bronson massaging Plaintiff's shoulders, Bronson testified and Plaintiff confirmed that he did it to other employees as well. (Dep. of Bronson pg. 77–78.; Dep. of Russell pg. 98). Defendants argue that the conduct by Bronson did not have sexual content and was not sexual in nature. The Court disagrees with this characterization of the evidence. The Court finds that Bronson's actions did have sexual content. For example, the involuntary sharing of one hotel room has sexual content given Bronson's self professed romantic interest towards the Plaintiff. The Court, considering the totality of the circumstances finds that Plaintiff has demonstrated that Bronson's conduct was sexual in nature and constitutes severe or pervasive harassment.[11]

Plaintiff's claims under ELCRA survive for the same reason. Looking at the totality of the circumstances, and evidence in the light most favorable to Plaintiff, Bronson's interest in Plaintiff was based on his sexual attraction to Plaintiff as a women. Plaintiff cites *Corley v. Detroit Board of Education*, 470 Mich. 274, 681 N.W.2d 342

(2004). In *Corley,* the plaintiff brought a sexual harassment action. Plaintiff and defendant her supervisor were romantically involved. When their relationship ended, defendant started dating a co-worker and repeatedly threatened plaintiff with adverse employment action if she interfered with his relationship. Plaintiff further alleged that defendant "taunted, embarrassed and humiliated her" by moving her work station and by engaging in "catty" conversation about her that were meant to be overheard by others. *Id.* at 276, 681 N.W.2d 342. The Michigan Court of Appeals held that these allegations constituted unwelcome sexual communications because they stemmed from defendant's past relationship with plaintiff. The Court reversed, and stated that "actionable sexual harassment requires conduct or communication that inherently pertains to sex." *Id.* at 7–8, 681 N.W.2d 342. BCN contends that Plaintiff's argument that Bronson's romantic pursuit of her was predicated upon his sexual attraction to Plaintiff as a women is the same argument advanced and rejected in *Corley.* (BCN's Reply pg. 4). *Corley* stated "MCL 37.2103(i) does not forbid the communication of enmity between romantic rivals, even if the predicate for the dislike is sexual competition, as long as the conduct or communication is not inherently sexual." *Id.* at 280, 681 N.W.2d 342.

The Court finds under *Corley* and ELCRA, Plaintiff's claim survives because Bronson's communication was inherently sexual. Bronson's communication and conduct displays a romantic interest in Plaintiff as a women, and his subsequent poor treatment of her was predicated on her rejection of him. The present facts are distinguishable from *Corley* because Bron-

---

11. Plaintiff has testified that she was humiliated and uncomfortable with Bronson's advances. The Court finds that this satisfies the subjective test that Plaintiff regarded the work environment as hostile under *Harris.*

son's advances were based on his romantic interest in Plaintiff. In *Corley,* there were no romantic advances, rather personal enmity stemming from a prior romantic relationship. The Court finds the distinction important. Accordingly, the Court finds that Bronson's conduct was "inherently sexual" under *Corley* and creates a question of fact with respect to the ELCRA claim.

### b. Insufficient Notice and the *Burlington* Affirmative Defense

BHC also argues that there was insufficient notice given by Plaintiff. Therefore, Plaintiff cannot establish a prima facie case. However, the Court finds that this argument fails because she twice complained to both supervisor Bronson (as required by the employee handbook) and BCN representative Judy Malone. (Plaintiff's Response to BCN pg. 9–10 fn. 12).

■ Defendants also claim that Plaintiff's ELCRA claims fails because there is no proof of respondeat superior because they did not have constructive or actual notice of the alleged harassment. Under Michigan law, the standard is "notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring." *Chambers v. Trettco, Inc.,* 463 Mich. 297, 319, 614 N.W.2d 910 (2000).

■ Plaintiff argues that it is clear that Defendants has sufficient notice because Bronson admitted he knew the letter contained allegations of sexual harassment. (Plaintiff's Brief in Opposition to BHC pg. 17; Dep. of Bronson pg. 48). The Court agrees with Plaintiff.

Defendants cite *Elezovic v. Ford Motor Company,* 259 Mich.App. 187, 673 N.W.2d 776 (2003). In *Elezovic,* the Court found that Plaintiffs communications to her employer were insufficient notice to establish respondent superior liability for sexual harassment under the ELCRA. The plaintiff's communications consisted of two verbal complaints and a letter written by plaintiff's son-in-law to defendant's supervisor of labor relations. The letter asserted:

> that [plaintiff] might take legal action 'to insure that client is not subjected to working in a hostile environment.' The letter did not mention that plaintiff was being subjected to sexual harassment. Although the letter...referenced a 'hostile environment' plaintiff admitted that its purpose was to notify [defendant] that she was accusing her co-worker, Tami Holcomb, of threatening her life and she also admitted that the letter was not communicating anything to [defendant] about there being sexual harassment.

The letters written by Plaintiff in this matter are distinguishable from the letter in *Elezovic.* The plaintiff in *Elezovic* admitted that the letter was not communicating anything relating to sexual harassment. Here, Plaintiff has made no such admissions. The purpose of Plaintiff's letters was to notify Defendants of Bronson's sexual harassment. Accordingly, the Court finds that the *Elezovic* case is distinguishable from these facts.

*Elezovic* also analyzed the plaintiff's verbal complaints to two of her supervisors. The plaintiff requested that the supervisors keep her complaints confidential. Here, while there is a factual dispute whether Plaintiff asked Malone to keep her complaints confidential, there is no dispute that Plaintiff made no such request to Bronson. Regardless, with respect to BHC and BCN, taking all facts in a light most favorable to Plaintiff, the Court finds Plaintiff's communications sufficient. Ac-

cordingly, the Court finds that BHC and BCN had sufficient notice under Title VII and ELCRA.

■ BCN states that the *Burlington* Affirmative Defense applies here. This defense stems from *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). The affirmative defense states where a direct supervisor is alleged to have created the hostile environment, the employer may raise an affirmative defense to liability. The defense comprises of two elements: (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise. *Id.* BCN further states that:

> Plaintiff either followed the policy by complaining to her supervisor and the harassment stopped because of the complaint (which it did, because Plaintiff has not complained of any sexual harassment that occurred after 2001), or she failed to report post 2001 harassment to BCN. Either way, Summary Judgment is appropriate.

BCN's Reply pg. 5.

It is noted that "no affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion or undesirable reassignment." *Id.* at 765, 118 S.Ct. 2257. Here, the Plaintiff alleges that the harassment culminated in a discharge. (Plaintiff's Response to BHC pg. 15).[12] Further Plaintiff twice complained to both supervisor Bronson (as required by the employee handbook) and

BCN representative Judy Malone. (Plaintiff's Response to BCN pg. 9–10 fn. 12). Accordingly, the Court rejects BCN's *Burlington* Affirmative Defense as to BHC and BCN.

In conclusion, for the reasons explained above, the Court denies Defendants' Motions for Summary Judgment.

**J. Violation of the Bullard–Plawecki Right to Know Act against Defendants BHC and BCN.**

■ Plaintiff alleges that Defendants violated the Bullard–Plawecki Employee Right to Know Act MCL 423.501 *et seq.* The Act states in applicable part:

> Sec. 2. Personnel record information which was not included in the personnel record but should have been as required by this act shall not be used by an employer in a judicial or quasi-judicial proceeding. However, personnel record information which, in the opinion of the judge in a judicial proceeding, was not intentionally excluded in the personnel record, may be used by the employer in the judicial or quasi-judicial proceeding, if the employee agrees or if the employee has been given a reasonable time to review the information. Material which should have been included in the personnel record shall be used at the request of the employee.

MCL § 423.502

> Sec. 11. If an employer violates this act, an employee may commence an action in the circuit court to compel compliance with this act. The circuit court for the county in which the complainant resides, the circuit court for the county in which the complainant is employed, or the circuit for the county in which the

---

**12.** Plaintiff also stated in her deposition that the "hostility in her office never really changed" (Dep. of Russell pg. 129).

personnel record is maintained shall have jurisdiction to issue the order. Failure to comply with an order of the court may be punished as contempt. In addition, the court shall award an employee prevailing in an action pursuant to this act the following damages:

(a) For a violation of this act, actual damages plus costs.

(b) For a wilful and knowing violation of this act, $200.00 plus costs, reasonable attorney's fees, and actual damages.

MCL § 423.511

Plaintiff argues that Defendants BHC and BCN violated the Bullard–Plawecki Right to Know Act by willfully and knowingly refusing to hand over Plaintiff's personnel file. (Plaintiff's Response to BCN pgs 13–14). Plaintiff also argues that Defendants did not produce a complete file for her review. (*Id.*). Plaintiff claims that the file was missing two letters dated July 29, 2001 and October 9, 2001 that she wrote to Bronson. (*Id.*).

BHC contends that because she received her file before she instituted this suit, Defendants did not violate the act. BHC also argues that it is undisputed that Plaintiff was in possession of the alleged two missing letters, and pursuant to *Beauchamp v. Great West Life Assurance Co.*, 918 F.Supp. 1091 (E.D.Mich.1996) cannot state a cause of action. (BHC's Brief pgs. 19–20).

BCN makes the same arguments as BHC and adds that there is no evidence of a willful violation by BCN. (BCN's Reply pg. 20). BCN states that Plaintiff's recovery is limited to actual damages, of which there are none, and she is not entitled to attorney fees under MCL § 423.511. (*Id.*).

Plaintiff alleges that Defendants BHC and BCN violated the Bullard–Plawecki Right to Know Act by willfully and know-ingly refusing to hand over Plaintiff's personnel file. Plaintiff did acknowledge that she received a copy of her file twice when she requested it from BCN. (Dep. of Russell, pg. 223–224). Plaintiff testified that she received it the first time around the time she was terminated and second time in June 2003. (*Id.*). BHC contends that because she received her file before she instituted this suit, Defendants did not violate the act. BHC argues that a plaintiff is not entitled to recover for a defendant's untimely production of a personnel file if the employer ultimately produces the file.

In *Leonard v. Board of Governors of Wayne State Univ.*, 2003 WL 1919530 (Mich.App.2003) (unpublished), the Court stated that MCL § 423.511 "contemplates awarding damages when the employer has failed to comply with the statute, and the plaintiff must bring a legal action to enforce compliance. It does not contemplate the situation here, where defendant eventually complied on its own, before plaintiff brought an action for damages," *Id.* at *6. Similarly here, the Court finds that MCL § 423.511 did not contemplate the situation here, where plaintiff eventually did obtain copies of her file.

Plaintiff also alleges that Defendants did not produce a complete file for her review. Plaintiff claims that the file was missing two letters dated July 29, 2001 and October 9, 2001 that she wrote to Bronson. BHC claims that in this case, it is undisputed that Plaintiff was in possession of the two letters, and pursuant to *Beauchamp v. Great West Life Assurance Co.*, 918 F.Supp. 1091 (E.D.Mich.1996) cannot state a cause of action.

In *Beauchamp*, the Court found no evidence that a U–4 form was intentionally withheld, and plaintiff who signed the form was aware of its existence. Under this reasoning, the Court finds that because Plaintiff possessed the two letters, there is

no cause of action under the Act. BCN makes the same arguments and adds that there is no evidence of a willful violation by BCN. BCN states that Plaintiff's recovery is limited to actual damages, of which there are none, and she is not entitled to attorney fees under MCL § 423.511. The Court agrees. Plaintiff has brought forth no evidence of a willful violation, and she already possessed copies of the letters, therefore she has no damages. Accordingly, the Court grants Defendants' Motion for Summary Judgment on this claim.

## K. Assault and Battery Claim

■ Plaintiff argues that Bronson committed assault and battery when he rubbed her shoulders without permission. (Plaintiff's Response to BHC pg. 12).

Bronson argues that Plaintiff cannot meet the requirements to establish an assault or battery. First, Bronson alleges that Plaintiff did not experience the reasonable fear or apprehension needed for an assault because she alleged that Bronson would sneak up behind her and massage her shoulders. (BHC's Brief pg. 18). Secondly, Bronson argues that in this case, there is no evidence that he intended to commit a willful and harmful offensive touching by massaging Plaintiff's shoulders. (Id. at 18–19). Therefore, Bronson states that the battery claim fails. (Id. at 19).

The Restatement (Second) of Torts § 21, which has been adopted in Michigan, states that a person is liable for assault if:

(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact; and

(b) the other is thereby put in such imminent apprehension.

*Mitchell v. Daly*, 133 Mich.App. 414, 426, 350 N.W.2d 772 (1984).

■ The intent needed for an assault is the intent to commit a battery or an intent to create in the victim a reasonable fear or apprehension of an immediate battery. *Id.* Bronson alleges that Plaintiff did not experience a reasonable fear or apprehension because she alleged that Bronson would sneak up behind her and massage her shoulders. Bronson states that a person must be aware of imminent contact to recover for assault. Restatement (Second) of Torts, § 24. Here, the Court finds that because Bronson snuck up behind her, Plaintiff did not experience a reasonable fear or apprehension. Accordingly, the Court grants Summary Judgment for Bronson on the Assault charge.

■ To recover for battery, Plaintiff must prove that there was a willful and harmful touching of another person which results from an act intending to cause such contact. *Espinoza v. Thomas*, 189 Mich. App. 110, 119, 472 N.W.2d 16 (1991). A battery is the willful or intentional touching of a person against that person's will by another person. SJI2d 115.02. Bronson argues that in this case, there is no evidence that Bronson intended to commit a willful and harmful offensive touching by massaging Plaintiff's shoulders. Bronson testified that he massaged other BHC employees' shoulders as well, and Plaintiff never told him to stop massaging her shoulders. (Dep. of Russell pg. 98). BHC argues that as a result, Bronson never had any knowledge that Plaintiff found the contact offensive. Bronson stated that he massaged his employees' shoulders to loosen them up. (Dep. of Bronson pg. 98). Plaintiff testified as follows:

Q. You already said he never attempted to touch or kiss you?

A. He didn't attempt to kiss me, I didn't say he didn't attempt to touch me. Massaging my shoulders in the office.

Q. Did he do that to other people in the office?

A. I saw him do it to Geri Schroeder once.

Q. Do you know who else he did it to?

A. No, I do not.

Q. Did you tell him not to do it?

A. No, I backed away, got up, I would get away from my desk.

Q. Did you tell him that it felt good?

A. No.

Q. But you never told him to stop?

A. No. I was afraid to confront him. I was afraid to confront him.

Here, the Court finds no evidence that Bronson intended to commit a harmful or wilful touching. Thus, the Court grants Bronson's Motion for Summary Judgment with respect to the Battery count.

### *BHC's MOTION FOR SANCTIONS*

BHC argues that Plaintiff and her counsel should be sanctioned pursuant to Fed. R.Civ.P. 11(c) for failing to withdraw the unsupported claims and allegations of:

(1) Title VII Individual liability of Andrew Bronson;

(2) Title VII and ELCRA Hostile Sexual Harassment Claim;

(3) Retaliation in Violation of Title VII and ELCRA;

(4) Title VII Pregnancy Discrimination;

(5) FMLA Claims

(6) Assault and/or Battery Against Andrew Bronson.

(BHC's Motion pgs. 1–14).

Plaintiff states that BHC flagrantly ignores record evidence and conflicting case law, and the allegations in its Complaint are both legally and factually supported. Plaintiff contends that this "present Motion is merely a verbatim recitation of Defendants' Motion for Summary Judgment." (Plaintiff's Reply pg. 3). Plaintiff

also requests for attorney fees and costs which were wrongly incurred for responding to this Motion. (*Id.* at 2).

The test for Rule 11 sanctions is whether counsel's conduct was reasonable under the circumstances. *Union Planters Bank v. L & J Development Company, Inc.,* 115 F.3d 378, 384 (6th Cir.1997). Fed.R.Civ.P. 11(b)(2) requires that in all pleadings filed with the Court "the claims, defenses, and other legal contentions therein are warranted by existing law or by a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(3) requires that "the allegations and other factual contentions have evidentiary support." In order to give a party an opportunity to avoid sanctions, Rule 11 contains a "safe harbor" provision that requires a party seeking sanctions to serve its motion on the opposing party at least 21 days prior to filing the motion. Fed.R.Civ.P. 11(C)(1)(a). Here, Plaintiff contests the Rule 11 allegations and has not withdrawn its claims.

### a. Andrew Bronson's Individual Liability under Title VII

BHC contends that Plaintiff's Title VII claims against Bronson individually lack a legal foundation because pursuant to *Wathen v. General Electric Co.,* 115 F.3d 400 (6th Cir.1997), Bronson was not an employer as defined in 42 U.S.C. § 2000e(b). However, the Court rejects BHC's Motion for Sanctions with this count. BHC alleges that it is a closely held corporation where Andrew Bronson owns 49% of the company's shares. However, for most of Plaintiff's employment he was the sole shareholder and president and was Plaintiff's direct supervisor. (Dep. of Bronson pgs. 4, 10–11). Accordingly, the Court finds that Plaintiff has a good faith argument that he was the "alter

ego" of the employer under *Curcio v. Chinn Enterprises, Inc.*, 887 F.Supp. 190 (N.D.Ill.1995).

#### b. Hostile Environment Sex Harassment Claim

BHC contends that because Plaintiff's Charge of Discrimination indicated that the dates of the alleged discrimination occurred between August 10, 2002 and June 6, 2003 Plaintiff can only recover for those incidents that occurred after August 10, 2002. BHC contends that most of the Complaint's allegations occurred prior to August 10, 2002.

However, the Court denies BHC's Motion with respect to this claim. *Haithcock v. Frank*, 958 F.2d 671, 675 (6th Cir.1992) holds that an EEOC Charge, which is filed by a law complainant, "should be liberally construed to encompass all charges reasonably expected to grow out of the charge of discrimination." *Id.* As stated previously, given the fact that Plaintiff did recite incidents of sex harassment and sex and pregnancy discrimination prior to August 2002 in her Intake Questionnaire and attached complaint, and guiding principles of *Haithcock*, the Court rejects Defendants' procedural argument. Accordingly, BHC's Motion for Sanctions is denied. Further, BHC claims that Plaintiff the incidents alleged by Plaintiff cannot amount to a hostile work environment claim under Title VII. However, the Court finds that Plaintiff's arguments do have evidentiary support and do not warrant sanctions. See the discussion above in Section I.

#### c. Retaliation in violation of Title VII and ELCRA

BHC claims that Plaintiff's retaliation claims are unsupported under either fact or law. As discussed in section H, the Court finds that Plaintiff's allegations are insufficient to survive Summary Judgment.

However, the Court finds that they are not so insufficient to warrant sanctions under Rule 11. Plaintiff's makes reasonable arguments to support a *prima facie* case. See Section H.

#### d. Pregnancy Discrimination under Title VII and ELCRA

As discussed in Section G, the Court finds that Plaintiff has brought sufficient evidence to survive Summary Judgment against BHC for Pregnancy Discrimination under Title VII and ELCRA. Accordingly, the Court dismisses BHC's request for sanctions with respect to this claim.

#### e. Common Law Assault and Battery

Plaintiff alleges that Bronson rubbed and touched her shoulders without her permission. The Court finds these allegations do have evidentiary support sufficient to defeat BHC's Motion for Sanctions. The Court finds that Plaintiff's claim is insufficient to survive Summary Judgment and takes notice that Plaintiff did not provide applicable case law to support its claim. However, the Court finds that the claim was not so baseless as to warrant sanctions.

#### f. Claims Under FMLA

BHC claims that Plaintiff's FMLA claims lack evidentiary and legal support because BHC does not satisfy the 50 employee requirement under the statute. (BHC's Motion pg. 13–14). The Court notes that BHC failed to substantively address the "joint employment" doctrine in its pleadings. Further, the Court accepted Plaintiff's argument. See Section A. Accordingly, the Court rejects BHC's Motion for Sanctions.

In conclusion, BHC has failed to demonstrated that Plaintiff acted unreasonably under the circumstances as required by

Rule 11. Consequently, the Court rejects its Motion for Sanctions.

The Court grants Plaintiff's request for attorney fees and costs because BHC's present Motion for Sanctions almost mirrors its Motion for Summary Judgment and Plaintiff's claims are not so unreasonable as to warrant sanctions.

## CONCLUSION

The Court DENIES Defendants' Motion for Summary Judgment on: (1) Plaintiffs' FMLA Interference claim; (2) Plaintiffs' FMLA Retaliation claim; (3) Plaintiffs' Title VII Pregnancy Discrimination claim; and (4) Plaintiffs' Title VII and ELCRA Hostile Work Environment claim.

The Court GRANTS Defendants' Motion for Summary Judgment on the remaining counts.

The Court DENIES BHC's Motion for Sanctions and GRANTS Plaintiff's Attorney fees and costs in defending the motion.

**SO ORDERED.**